34397. GEORGIA POWER COMPANY *v.* REID.

Decided February 14, 1953.

*MacDougald, Troutman, Sams & Schroder,* for plaintiff in error.

*T. Elton Drake, Hugh Carney, John M. Williams,* contra.

SUTTON, C. J. Mrs. C. M. Reid claimed benefits under the Workmen's Compensation Act for the death of her husband, against his employer, the Georgia Power Company. The evidence submitted on the hearing of the case disclosed that the claimant's husband, C. M. Reid, had been employed by the defendant power company as a truck driver at an average weekly wage of more than $48. On April 5, 1951, Reid was seen as he opened the door of a small ladder truck which he was to drive; he stepped up and appeared to be getting about halfway in, when he slumped and fell backwards. This occurred at about 8 a.m. Reid seemed to gasp a time or two; there was a gurgling sound in his throat, and he died in a minute from the time he fell.

Reid worked on street lighting, and his work began at 8 a.m. Employees so engaged usually changed clothes and punched a clock in the company's building at 211 Decatur Street in Atlanta; and then, at 8 a.m. or shortly before, walked a block or two to the company's Gilmer Street lot where the trucks were parked and where the drivers were to receive their orders from the foreman. Reid was not seen by any of the witnesses testifying, at 211 Decatur Street on the morning when he died. The claimant was Reid's wife and sole dependent. There was no dispute as to the foregoing facts.

The case was heard by a deputy director of the board. A finding was made that Reid's death arose out of and in the course of his employment, and an award for the claimant was entered, which was affirmed on appeal to the full board. The exception here is to the affirmance by the superior court of the board's award.

■ There was evidence to support the finding that the exertion of climbing into the truck affected Reid's pre-existing heart condition and was a contributing cause of his death. As to Reid's previous condition, the claimant testified that her husband, Reid, had complained of pain in his chest and of being

unable to get his breath at night, and that he had so complained the night before he died. Records of the Veterans Administration, which were introduced by the defendant, showed that, on September 4, 1945, Reid was admitted to a V.A. hospital and was under treatment until November 30, 1945, for an enlarged and weakened heart and a condition known as paroxysmal auricular tachycardia, or recurrent periods of abnormally rapid heartbeat. A physical examination of September 15, 1945, showed that Reid's pulse was weak and difficult to count accurately; that his cardiac sounds were of poor quality, but that the rhythm was regular at a rate of 200 per minute; and that Reid was raising frothy, bloody sputum from his lungs, "due to a pulmonary congestion, incident to his cardiac condition." A supplemental report upon Reid's discharge from the hospital stated: "After some time, the auricular paroxysmal tachycardia subsided but during this period the patient developed acute pulmonary congestion with pleural effusion, which was removed. Patient was left with a chronic pleurisy on the left side, fibronous [fibrinous?] in character." On an examination made on October 23, 1946, to review Reid's pension rating of 100% disability, Reid stated that he had "had rapid heart action occasionally but it has not given me a lot of trouble." His heart sounds were "distant," and his pulse rate was 100. The diagnosis was "sinus tachycardia," and on the basis of this, Reid's disability rating was reduced from 100% to 10%.

Reid was again hospitalized on May 14, 1949, in the psychiatric ward of a V.A. hospital. On an examination made during his previous hospitalization, on September 29, 1945, Reid had stated that he had "been rather befuddled in his thoughts, i.e., he couldn't get things through his head very well." In 1949, "He was confused, disoriented, described visual and auditory hallucinations and persecutory delusions." He was found to have mild generalized arteriosclerosis, or hardening and thickening of the arteries, and "There were varicosities of both lower legs, left more than right, with minimal pitting edema of both lower extremities." His condition was diagnosed as toxic psychosis, and he was discharged from the hospital on May 25, 1949.

The death certificate, prepared by the coroner, showed the

following: "Condition or complication directly leading to death: Probably congestive heart failure. Morbid condition, if any, giving rise to above cause: Respiratory infection."

Dr. Roy H. McClung, upon being qualified as an expert, was given the facts that Reid was 49 years old, climbed halfway into the truck, and fell back to the ground where he died without regaining consciousness, that Reid had a history of having cardiac enlargement and paroxysmal auricular tachycardia with myocardial insufficiency in 1945, and that his death occurred on April 5, 1951. He then testified that in his opinion Reid died of massive coronary thrombosis, precipitated by the exertion of pulling himself into the truck. On cross-examination, Dr. McClung testified that the reduction in Reid's disability rating from 100% to 10% indicated that the Veterans Administration thought that Reid's condition had improved, rather than that it had actually improved. As to whether a man having such a heart condition would continue to feel the effects of it and complain about it, he testified: "Ninety percent of them do, and ten percent of them do not; roughly, that is true. I mean by that, ten percent of them will go along with the pain and discomfort and stricture of the chest and tightness; they have a heart attack and die." He explained that Reid's condition was progressive: "It is usually arteriosclerosis of the coronary arteries, and the blood gets to the point that it clots, and the arteriosclerosis itself eliminates the opening in the artery, and the man has the artery affected and also the heart muscle."

He further testified: "Congestive heart failure means that the heart is not able to carry out the circulation in a normal manner, and means also, as a result of this, a patient develops edema in the feet and legs. A man might get along and develop abdominal fluid, and have congestion long before it comes to heart failure. It is not a thrombosis condition, but "means weakened heart muscles, heart disease." He testified that Reid could not have died suddenly from the conditions of congestive heart failure or respiratory infection, as set out in the death certificate, but that, if Reid had those conditions and died suddenly, he would have died of coronary thrombosis. This opinion was based "on the fact that he [Reid] had this heart disease for six years, and he was carrying out exertion there, when he got on

this truck, and that is one of the things that we know often precipitates a case of coronary thrombosis." The diseased condition of Reid's heart had developed to the place that the exertion of climbing into the truck, while not unusual, was sufficient to precipitate coronary thrombosis.

This evidence was sufficient to establish that Reid's death arose out of or was caused in part by his employment. As ruled in *Williams* v. *Maryland Casualty Co.*, 67 *Ga. App.* 649 (2, 3) (21 S. E. 2d, 478), "An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or the condition of health"; and "A physical impact is not a necessary prerequisite to an 'injury' within the compensation act." While there was evidence that examinations made after those of 1945, upon which Dr. McClung's opinion was based, had shown a change in Reid's condition or had resulted in a different diagnosis thereof, nevertheless, the symptoms described in those subsequent examinations, in the death certificate, and by the claimant, of pitting edema or swelling in Reid's feet, of arteriosclerosis, of constriction and pain in his chest, of "congestive heart failure," and of pleurisy and "respiratory infection," were shown by the medical testimony to be symptoms of a diseased heart which was susceptible to coronary thrombosis.

■ The defendant employer also contends that the finding that Reid's death occurred in the course of his employment was unauthorized by the evidence. Work began at 8 a.m. for Reid, and whether Reid died a few minutes before or after that time makes little difference under the other circumstances of the case. Employees of the defendant were to punch a clock at 211 Decatur Street, at or before 8 a.m., and then go to the defendant's Gilmer Street lot. It appears that the defendant's employees were permitted to enter this lot a reasonable time before beginning work; and Reid, while climbing into his truck, was then preparing to perform his duties as driver of the truck and would have been ready to go upon receiving his instructions from the foreman. His death was shown to have occurred in the course or period of his employment. See *General Accident, Fire &c. Corp.* v. *Worley*, 86 *Ga. App.* 794 (72 S. E. 2d, 560); *Employers Ins. Co. of Alabama* v. *Bass*, 81 *Ga. App.* 306 (58 S. E. 2d, 516).

■ The findings of the board, upon which the award of death benefits to the claimant was based, were supported by the evidence, and the superior court did not err in affirming the award of the board.

*Judgment affirmed. Felton and Worrill, JJ., concur.*